**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

| | | |
|---|---|---|
| **LLOYD MICHAEL HAMILTON,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | **CIVIL ACTION NO. 6:22-cv-00001** |
| **CONOCOPHILLIPS CO. AND** | § | |
| **BURLINGTON RESOURCES OIL** | § | |
| **& GAS CO. LP,** | § | |
| **Defendants.** | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

### Nature of the Case

1.      Plaintiff, Mr. Lloyd Hamilton, brings this action under the Endangered Species Act, 16

U.S.C. § 1531 *et seq.*, seeking to protect an endangered cat, the jaguarundi, on his ranch near

Cuero, DeWitt County, Texas.



2.

---

[1] Exemplar for illustration purposes.

3.      The Gulf Coast Jaguarundi is an endangered wild cat, which was placed on the Endangered Species List in 1975 as part of a listing of 216 species and is considered endangered wherever it is found in Texas.[2]   40 FR 44392, 44333.

4.      This action is of major significance in the conservation community as the jaguarundi had been thought by some to be extinct in the United States since the 1980's.  The importance of the presence of this extremely rare cat in the United States is a major moment for conservationists responsible for our state and nation's most threatened wildlife.

5.      In short, Defendants intend to use a drill pad of six to twelve acres in size, an access road bulldozed through "ideal habitat," and construct a pipeline and a power line corridor, on Plaintiff's land.  Further, they intend to drill six to twelve oil and gas wells, then use high pressure equipment to "frac" the wells, build production facilities including a several mile long pipeline and possibly a compressor station to pressurize the natural gas in order to put it into a pipeline proposed to be built.

6.      Plaintiff believes Defendants will seek in the future to bulldoze more pads in other areas of "suitable habitat"[3] elsewhere on the ranch in an area known as the "Deer Pasture."

7.      ***Plaintiff does not seek to stop Defendants from drilling and producing oil and gas or related reasonable and necessary activity, that is neither the goal nor purpose of this case.  The <u>issue is the location</u> of the proposed activities, the habitat modified or destroyed and disturbance to the jaguarundis from the sound, light, and activity associated with the construction of pads, pipelines, power lines, tanks, drilling, fracking, trucking, construction, and maintaining wells in and near an area known as the "Deer Pasture."***

---

[2] https://ecos.fws.gov/ecp0/profile/speciesProfile?spcode=A05H

[3] ESA terminology for habitat important to the endangered animal.

8.    Plaintiff brings this action seeking a permanent injunction to protect the areas in which jaguarundi have been seen repeatedly as reported by at least ten witnesses.

*9.*    Defendants previously drilled wells in the Deer Pasture on the southern boundary, drilling in a direction from south to north to drain oil and gas under the Deer Pasture.   Now Defendants also insist they must be allowed to drill from the northern boundary of the Deer Pasture, drilling north to south *in areas in which jaguarundis have been seen according to sworn trial testimony of hunters in the Deer Pasture.*

10.    In an oil and gas law issues trial, Defendants stated in closing:

> So you can fully credit the hunters. Yes, they saw whatever they saw. They saw a jaguarundi even, but it was in the past....[4]

> ...And I said the hunters believed what they saw and as I said -- and I'm saying to you, again, you can fully credit the hunters' testimony. They saw a jaguarundi back then when they saw it, and that's what I said I [sic] opening.[5]

11.    So, Defendants expressly agreed with the hunters' testimony and told the state court jurors during trial the hunters did actually see jaguarundis.

12.    Defendants have stated that they can still drill south to north and produce using locations in an area already disturbed and in which jaguarundis have <u>not</u> been reported by anyone.  However, Defendants now insist they prefer to drill in a north to south direction in areas in which jaguarundis have been seen in disregard of the endangered cat and the Endangered Species Act.

---

[4] Mazzone Closing 66/16 – 66/18

[5] Mazzone Closing 67/13 – 67/17

13.   Defendants' project managers, Alisdair Farthing and his successor Duncan Thom, estimate the difference between drilling north to south vs. south to north will result in only about a 4% difference in production.

14.   However, rather than enjoying the potential benefit to Mr. Hamilton's personal interest of an extra 4% of oil and gas production royalties, he seeks to protect the wildlife and natural treasures left to him by his father, who received it from his father, who received it from his father, going back five generations of his family.

15.   To create an access road, Defendants bulldozed some habitat described by their own environmental consultant as "ideal" for this endangered cat.

16.   Plaintiff seeks penalties payable to the United States government for a past violation of the Endangered Species Act, and forward looking permanent injunctive relief that will protect the endangered cats from further habitat destruction in the future, from excessive noise and light disturbance from construction, drilling, fracking, power line corridors, pipeline construction, compressor operations, trucking, operation of heavy equipment, and general disruption.

## **PARTIES**

17.   Plaintiff Lloyd Michael Hamilton resides near Cuero in DeWitt County, Texas.

18.   Defendant ConocoPhillips Company is a Delaware corporation doing business in Texas with its operational headquarters in Houston, Texas.

19.   It may be served through its registered agent:

United States Corporation Company

211 E. 7th Street

Suite 620

Austin, Texas 78701-3218.

20.   Defendant Burlington Resources Oil & Gas Company LP is a wholly owned subsidiary of defendant ConocoPhillips Company, "Conoco", and controlled by Conoco.

21.     Burlington Resources is a Delaware corporation transacting business in Texas with its operational headquarters in Houston, Texas.

22.     Burlington Resources may be served through its registered agent:

Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company

211 E. 7th Street

Suite 620

Austin, Texas 78701-3218

## **VENUE**

23.     The events giving rise to this action relate to protecting an endangered animal in DeWitt County, Texas, which is in the Victoria Division of the Southern District of Texas.

24.     The past acts which are part of the basis for this complaint occurred in DeWitt County, Texas, which is in the Victoria Division of the Southern District of Texas.

25.     Further, both defendants have their operational headquarters in Houston, Texas, which is in the Southern District of Texas.

26.     Therefore, venue is proper in this court pursuant to 28 U.S.C. § 1391.

27.     Additionally, the Endangered Species Act provides venue is proper where the acts constituting violations occurred.  16 U.S.C.A. § 1540 (3)(A) ("Any suit under this subsection may be brought in the judicial district in which the violation occurs.").

## **PERSONAL JURISDICTION OVER**
## **OUT-OF-STATE INCORPORATED DEFENDANTS**

28.     The Court has specific jurisdiction as the past events and proposed future events made the basis of this action arise from and relate to activity in DeWitt County, Texas, which is in this division and district. Further, this Court has general personal jurisdiction over Defendants as the corporations have their principal places of business in this state in Houston, Texas. *See, Bristol-*

*Myers Squibb Co. v. Superior Court of California, San Francisco County*, --- U.S.---, 137 S. Ct. 1773, 1779–80, 198 L. Ed. 2d 395 (2017).

## FEDERAL QUESTION SUBJECT MATTER JURISDICTION

29.     Plaintiff, Mr. Lloyd Hamilton, brings this action under the Endangered Species Act, 16 U.S.C. § 1531 *et seq.* seeking to protect an endangered cat, the jaguarundi, on his ranch near Cuero in DeWitt County, Texas.

30.     "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331.

31.     Plaintiff has issued the necessary prerequisite citizen suit notice of intent to sue and has waited more than sixty days as required by the Endangered Species Act, 16 U.S.C. §1540(g)(1)(A).

## THE AMERICAN HISTORY AND HERITAGE OF PROTECTING WILDLIFE

32.     "Defenders of the short-sighted men who in their greed and selfishness will, if permitted, rob our country of half its charm by their reckless extermination of all useful and beautiful wild things sometimes seek to champion them by saying the 'the game belongs to the people.' So it does; and not merely to the people now alive, but to the unborn people. The 'greatest good for the greatest number' applies to the number within the womb of time, compared to which those now alive form but an insignificant fraction. Our duty to the whole, including the unborn generations, bids us restrain an unprincipled present-day minority from wasting the heritage of these unborn generations. The movement for the conservation of wild life and the larger movement for the conservation of all our natural resources are essentially democratic in spirit, purpose, and method."

President Theodore Roosevelt, 1916[6]

---

[6] https://theodoreroosevelt.org/content.aspx?page_id=22&club_id=991271&module_id=339333



33.     Endangered Species Act Signing Statement of President Richard Nixon

December 28, 1973

I HAVE today signed S. 1983, the Endangered Species Act of 1973. At a time when Americans are more concerned than ever with conserving our natural resources, this legislation provides the Federal Government with needed authority to protect an irreplaceable part of our national heritage--threatened wildlife.

This important measure grants the Government both the authority to make early identification of endangered species and the means to act quickly and thoroughly to save them from extinction. It also puts into effect the Convention on International Trade in Endangered Species of Wild Fauna and Flora signed in Washington on March 3, 1973.

Nothing is more priceless and more worthy of preservation than the rich array of animal life with which our country has been blessed. It is a many-faceted treasure, of value to scholars, scientists, and nature lovers alike, and it forms a vital part of the heritage we all share as Americans. I congratulate the 93d Congress for taking this important step toward protecting a heritage which we hold in trust to countless future generations of our fellow citizens. Their lives will be richer, and America will be more beautiful in the years ahead, thanks to the measure that I have the pleasure of signing into law today.

*Note: As enacted, S. 1983 is Public Law 93005 (87 Stat. 884).*

*The statement was released at San Clemente, Calif.*

Richard Nixon, Statement on Signing the Endangered Species Act of 1973. Online by Gerhard Peters and John T. Woolley, The American Presidency Project[7]

## PURPOSE AND POLICY OF THE ENDANGERED SPECIES ACT

34. 16 U.S.C.A. § 1531 Endangered Species Act

**(a) Findings**

The Congress finds and declares that--

(1) various species of fish, wildlife, and plants in the United States have been rendered extinct as a consequence of economic growth and development untempered by adequate concern and conservation;

(2) other species of fish, wildlife, and plants have been so depleted in numbers that they are in danger of or threatened with extinction;

(3) these species of fish, wildlife, and plants are of esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people;

(4) the United States has pledged itself as a sovereign state in the international community to conserve to the extent practicable the various species of fish or wildlife and plants facing extinction, pursuant to--

(A) migratory bird treaties with Canada and Mexico;

(B) the Migratory and Endangered Bird Treaty with Japan;

(C) the Convention on Nature Protection and Wildlife Preservation in the Western Hemisphere;

(D) the International Convention for the Northwest Atlantic Fisheries;

(E) the International Convention for the High Seas Fisheries of the North Pacific Ocean;

---

[7] https://www.presidency.ucsb.edu/node/255904

(F) the Convention on International Trade in Endangered Species of Wild Fauna and Flora; and

(G) other international agreements; and

(5) encouraging the States and other interested parties, through Federal financial assistance and a system of incentives, to develop and maintain conservation programs which meet national and international standards is a key to meeting the Nation's international commitments and to better safeguarding, for the benefit of all citizens, the Nation's heritage in fish, wildlife, and plants.

**(b) Purposes**

The purposes of this chapter are to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, to provide a program for the conservation of such endangered species and threatened species, and to take such steps as may be appropriate to achieve the purposes of the treaties and conventions set forth in subsection (a) of this section.

**(c) Policy**

(1) It is further declared to be the policy of Congress that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this chapter.

(2) It is further declared to be the policy of Congress that Federal agencies shall cooperate with State and local agencies to resolve water resource issues in concert with conservation of endangered species.

## <u>STANDING OF MR. HAMILTON TO BRING AN ESA CASE</u>

35.     To satisfy Article III's standing requirements, the plaintiff must show (1) he has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3)

it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Friends of the Earth, Inc. v. Laidlaw Envtl. Services (TOC), Inc.,* 528 U.S. 167, 180–81, 120 S. Ct. 693, 704, 145 L. Ed. 2d 610 (2000).

36. The United States Supreme Court has recognized that the ESA's citizen suit provision is "an authorization of remarkable breadth" which Congress intended to be a central and integral part of the ESA's enforcement. *Bennett v. Spear*, 520 U.S. 154, 164–65 (1997) ("the obvious purpose of the [citizen suit provision] is to encourage enforcement by so-called '**private attorneys general**' "). In enacting the ESA, Congress intentionally created a broad citizen suit provision to allow private enforcement to further the important statutory objectives of the Act. 16 U.S.C. § 1540(g)(1)(A) (authorizing a private right of action "to enjoin any person ... who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof."); *see also Bennett*, 520 U.S. at 164–65. As noted above, for pleading, general factual allegations of injury resulting from the defendant's conduct suffice, because on a motion to dismiss, the court presumes that the general allegations embrace those specific facts that are necessary to support the claim. *Lujan*, 504 U.S. at 561 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

*Friends of Lydia Ann Channel v. U.S. Army Corps of Engineers*, 2016 WL 6876652 at \*5 (S.D. Tex. 2016)(emphasis added).

37.     Plaintiff, Mr. Hamilton, is an owner of property used by jaguarundi.  He has seen a jaguarundi in the area sought to be protected.

38.     Mr. Hamilton seeks to protect the endangered jaguarundi and the other animals and their habitat as a caring steward of the wildlife.

39.     The relief requested in this action would protect the endangered jaguarundi he seeks to protect from activity of Defendants.

40.     Thus, Mr. Hamilton satisfies the standing requirements of Article III and more specifically the standing requirements of the Endangered Species Act.

## **ADDITIONAL FACTS**

41.     At least nine eyewitnesses other than Mr. Hamilton have seen the jaguarundis of various colors on the property sought to be protected.

42.     Just as humans have different hair colors, so do jaguarundis.  Their color may be charcoal, red, blond/yellow, and combinations such as red and black as seen in the photo at the beginning of this complaint, which has a red head and charcoal colored body.  Their color remains fixed for life. So, a red jaguarundi always remains red.  A charcoal jaguarundi always remains charcoal over its life.  A bi-colored jaguarundi remains so over its life.    The sightings that have occurred over at least ten-year period describe the different colors of jaguarundis leading to the conclusion that multiple individuals of species are present.  Also, the sightings of any wild cat are very rare by the average observer.  For at least nine or more different people to see these extremely rare cats over a ten or more year period is evidence of how important this habitat is to the these animals and the frequency with which they use it.

43.     Here are some representative videos showing jaguarundis smallish size, slightly bigger and more robust than an average house cat, but with a distinctly longer body creating the appearance of short legs.  They also are known as "otter cats" due to their uniquely long bodies similar to otters.

44.     Charcoal example: https://www.youtube.com/watch?v=Fb8mKpraZjk

45.     Red jaguarundi example: https://www.youtube.com/watch?v=QR9tu-VB8xk

46.     Defendants propose to build drill pads and conduct drilling in the northern half of the Deer Pasture.

47.     Without going into the details of their testimony, witnesses testified generally as follows.

48.     At least six hunters have testified under oath, subject to cross-examination by Defendants, that they saw jaguarundis in the areas sought to be protected.   None reported seeing jaguarundis in the southern half of the Deer Pasture in areas where oil and gas drilling had occurred previously.

49.    Two of these witnesses, Mr. Paul Kesseler and Mr. Clayton Marcelle, are executives with companies in the oil industry so have no question of being hostile to the oil industry.

50.    Wayne Miller is a man that has spent 50+ years hunting and chasing cats with specially trained hounds.  He has testified that he has seen thousands of bobcats, thirty-one mountain lions, and saw jaguarundis on two separate occasions.  One of the two jaguarundi sightings was so close and so clear, he could determine the cat was a male because he could see the scrotum.  One of the cats was crossing the road in the general area described by Mr. Hamilton and Ms. Williams near the area where Conoco built the massive pad.  His other sighting was farther down the road.

51.    Paul Kessler is a hunter.   He testified that while hunting in the Deer Pasture, he saw a jaguarundi.

52.    Jeff Kessler is a hunter.  He testified that while hunting in the Deer Pasture, he saw a jaguarundi.

53.    Clayton Marcelle is a hunter.  He testified that while hunting turkeys in the spring turkey season with his son, they saw a jaguarundi.  He attempted to video the jaguarundi with his cell phone.

54.    Mike Bilberry is a hunter.  He testified that while hunting in the Deer Pasture, he saw a jaguarundi and observed it for approximately one hour with his $3,000 Swarovski binoculars.

55.    The sightings closest to already constructed oil and gas drill pads are at least 0.6 miles away. This evidence indicates that the construction of the pads and related activities cause the cats to stay at least 0.6 miles away.

56.    In the oil and gas law issues trial, Defendants stated in closing:

```
So you can fully credit the hunters. Yes, they saw
whatever they saw. They saw a jaguarundi even, but
it was in the past....8

...And I said the hunters believed what they saw
and as I said -- and I'm saying to you, again, you
can fully credit the hunters' testimony. They saw a
jaguarundi back then when they saw it, and that's
what I said I [sic] opening.9
```

57.     The Defendants consulted with the US Fish & Wildlife Service, "USFWS," at least as early

as July, 2020, about jaguarundis on the Hamilton Ranch.

58.     The USFWS advised Conoco that the USFWS considered the reports of the witnesses

"credible."   USFWS followed up in writing to Defendants in very clear and unambiguous terms.

See, Exhibit 1, USFWS letter of July 29, 2020, letter to addressed to Defendant Conoco employee

Josh Ozment.

59.     The USFWS letter of July 29, 2020, shows that it also was sent to Matt Fox.  Exhibit 1.

60.     Mr. Matt Fox was the Executive Vice-President and Chief Operating Officer of Conoco.

He retired on May 1, 2021.[10]

61.     The USFWS clearly informed Conoco of "credible reports" of jaguarundi.    USFWS

advised  Conoco that if it were to avoid jaguarundi habitat, then it could utilize "Best Management

Practices," also referred to as "BMP's," for working in areas near jaguarundi habitat.

---

[8] Mazzone Closing 66/16 – 66/18

[9] Mazzone Closing 67/13 – 67/17

[10] https://www.conocophillips.com/news-media/story/conocophillips-announces-matt-fox-to-retire-after-35-years-with-the-company/

62.     Such communications to Defendants are evidence of subjective knowledge, a "knowing" mens rea.

63.     The inescapable conclusion is Defendants made a conscious, deliberate, "knowing" decision with the knowledge of the highest-level corporate executives to proceed despite the request of the USFWS to avoid jaguarundi habitat and to submit a "habitat conservation plan" pursuant to Section 10 of the Endangered Species Act.

64.     Despite the direct communications to Defendants informing them of the presence of the jaguarundis on the ranch and despite further admonition and requests from the USFWS not to proceed with their plans, Defendants knowingly and intentionally disregarded this information and these requests and proceeded to bring in heavy earth-moving equipment and began to construct a massive drill pad by removing and leveling a substantial portion of a hill and thereby create a drill pad rising 31' above the land in an area in which Mr. Hamilton and others have seen jaguarundis.

65.     On August 29, 2020, Conoco employee Mr. Bill Pace was on site directing the hilltop leveling and earth moving activities.  Mr. Pace identified himself to Mr. Hamilton as the Conoco manager in charge of the work.  Mr. Pace wore a hard hat with a Conoco logo.  As the work was done under the direction of a managerial level employee and apparent agent of Conoco, the actual destructive acts are the acts of the corporation.

66.     Based on the USFWS letter of July 29, 2020, sent to Mr. Matt Fox, the Executive Vice-President and Chief Operating Officer, Plaintiff believes that Mr. Bill Pace was working at the direction of higher-level executives of Conoco instructing him what to do.  Plaintiff does not know the names of these higher-level decision makers, other than Mr. Matt Fox, but Mr. Pace almost certainly did not act alone on his own decision to conduct this work.

67.     Thus, the Court may fairly conclude that the highest-level executives of Conoco knew of this situation and approved it going forward despite the presence of the endangered species, the objections of Mr. Hamilton, and the written requests of the USFWS.

68.     Here are videos taken on August 29, 2020, of the hilltop removal and creation of the pad constituting the past acts complained of as a past violation of the Endangered Species Act.  Mr. Hamilton had personally observed a jaguarundi in this immediate area in 2019 as did other witnesses, Ms. Savannah Williams, and Mr. Wayne Miller.

69.     https://www.youtube.com/watch?v=Vimr_uQO1JQ

70.     https://www.youtube.com/watch?v=VI5hzSx1mrQ&list=PLqMMnDLuqPvd3DleVVU0ljfHnUQAzrN53

71.     https://www.youtube.com/watch?v=VeIE7C_JLLs&list=PLqMMnDLuqPvd3DleVVU0ljfHnUQAzrN53&index=2

72.     https://www.youtube.com/watch?v=pp0pxx7i5fQ&list=PLqMMnDLuqPvd3DleVVU0ljfHnUQAzrN53&index=3

73.     https://www.youtube.com/watch?v=rZ9R5x1q-Z4&list=PLqMMnDLuqPvd3DleVVU0ljfHnUQAzrN53&index=4

74.     https://www.youtube.com/watch?v=QzJ99AWtXn8

75.     https://www.youtube.com/watch?v=JYe42ov2cE4

76.     https://www.youtube.com/watch?v=8mMOi0obyZo

77.     https://www.youtube.com/watch?v=LJbGciwBM5E

78.     Here is a side view of the result of Conoco's acts from the parking area near Mr. Hamilton's front entry gate, an area in which jaguarundis have been seen by Mr. Hamilton, Ms. Williams, and Mr. Miller.



79.

80.     Such "knowing violation" of the Endangered Species Act is an egregious act, which should be severely punished.

81.     USFWS sent another letter to Conoco on September 3, 2020, requesting it not proceed further.   See, Exhibit 2, September 3, 2020, USFWS to Mr. Sam Widmer, Conoco Senior Regulatory Coordinator

82.     Conoco continued its activities undeterred, until a state court issued a temporary restraining order.

83.     The decisions and actions made the basis of this complaint have been by persons employed by Conoco on behalf of Conoco and the nominal holder of the lease, Burlington Resources.

84.     Burlington Resources is a wholly owned subsidiary of and controlled by Conoco for the benefit of Conoco.

85.     Burlington Resources is not known to have any actual employees.

86.     Conoco employees act on behalf of Conoco ostensibly through the rights of the oil and gas lease previously obtained by Burlington Resources.

87.     Thus, while Burlington Resources rightly is a defendant and subject of the request for injunctive relief, Conoco itself is the corporate wrongdoer, which should be punished and enjoined.

88.     The rights, duties, and alleged breaches of the lease agreements are subject to complex state litigation under Texas oil and gas law and are not a part of this action.

89.     Conversely, the enforcement of the Endangered Species Act was not and is not a part of the state court action.

90.     The state court zealously excluded any mention of the Endangered Species Act in the state court proceeding, going as far as expressly ordering the parties and witnesses not to even use the word "endangered" or even "protected" in the state court proceeding.

91.     So, a past wrong, a past violation, of the ESA is before the Court for civil enforcement and presents a case or controversy ripe for decision by the Court.

92.     However, the greater driving force behind this action and the need for protection sought is not only the past violation of the ESA, but the Defendants' ***proposed future acts***, overtly planned and announced, of Defendants to bring in a large drilling rig several stories tall to drill wells, "frac" the wells from this pad, the highest point in the immediate area, which causes horrendous loud piercing sounds and bright night lighting up to a mile or more away.

93.     Defendants also intend to put a string of drill pads across the northern side of the Deer Pasture in the future, where multiple witnesses, the hunters, have reported seeing jaguarundis.

94.     The drilling, completion, and other work necessary to complete the wells in the locations proposed by Defendants, pose an imminent risk of irreparable harm to the jaguarundis.

95.     Defendants also intend to build a pipeline on this land to connect the wells into their distribution network miles away.

96.     Defendants also propose to clear brush through the Deer Pasture to build a miles long electric supply line corridor to this and the other proposed pads.

97.     To push the product through the pipeline, Defendants may construct and operate a compressor station on a permanent ongoing basis for years.

98.     Compressor stations also generate loud, piercing noise, which is offensive and highly disruptive.  Cats' hearing is generally acknowledged to be more sensitive than human hearing.

99.     The drilling and fracking of the wells is so dangerous that OSHA has at least seven advisories and rules specific to the hazards of fracking.

100.    Excessively loud sound is such a risk from drilling rig activity that specialized businesses provide noise control services specifically for drilling rig noise:

https://www.noisemonitoringservices.com/drilling-rig-noise-control/

101.    A ripe and real case or controversy is before this Court.

102.    All facts including all exhibits are incorporated by reference into each cause of action without restating them in each cause of action.

103.    Each cause of action is pled in the alternative, and also cumulatively.

104.    Plaintiff reserves the right to an election of remedies.

## CAUSE OF ACTION 1

## DEFENDANTS' PAST
## VIOLATION OF SECTION 9
## OF THE ENDANGERED SPECIES ACT

105.    All facts pled elsewhere are incorporated by reference.

106.    The key provision forming the basis of this action is a violation of Section 9 of the Endangered Species Act due to the destruction of "ideal" habitat to construct an access road to the proposed pad and the destruction of habitat to construct the 31' tall pad where witnesses had seen jaguarundis.

107.    The USFWS and expert environmental consultants dealing with ESA compliance issues typically refer to sections of the Endangered Species Act by section numbers of the original bill for shorthand reference rather than statutory or CFR citations.

*See*:   https://fws.gov/endangered/laws-policies/esa.html; full text of the original Endangered Species Act with section numbers as used by the agencies and consultants may be found here:

https://fws.gov/endangered/esa-library/pdf/ESAall.pdf

108.    Defendants have already violated Section 9 of the Endangered Species Act by degrading "suitable habitat" through habitat modification, noise disturbance, and human activity resulting in significant disruption and impairment of feeding, breeding and sheltering behaviors of the Gulf Coast Jaguarundi, *Herpailurus[11] yagouaroundi cacomitli* in violation of the regulatory definitions of "take."

109.    The Endangered Species Act, 16 U.S.C.A. § 1538 Prohibited Acts (also referred to as Section 9) – provides:

---

[11] The genus for this very unique cat has changed a few times and may show up in some studies as genus "puma" or "felis." Nonetheless, the studies are describing this same cat and all use the common name "jaguarundi."  At this time, jaguarundi is the only member of this genus.

(a) Generally

(1) Except as provided in sections 1535(g)(2) and 1539 of this title, with respect to any endangered species of fish or wildlife listed pursuant to section 1533 of this title it is unlawful for any person subject to the jurisdiction of the United States to--

> …
> (B) take any such species within the United States or the territorial sea of the United States; …or
>
> (G) violate any regulation pertaining to such species or to any threatened species of fish or wildlife listed pursuant to section 1533 of this title and promulgated by the Secretary pursuant to authority provided by this chapter.

110.    Definition of "Take" - 16 U.S.C.A. § 1532 (19) The term "take" means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct.

111.    50 C.F.R. § 17.3 further defines the definition of "take":

"Harass" in the definition of "take" in the Act means an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering. This definition, when applied to captive wildlife, does not include generally accepted:
(1) Animal husbandry practices that meet or exceed the minimum standards for facilities and care under the Animal Welfare Act,
(2) Breeding procedures, or
(3) Provisions of veterinary care for confining, tranquilizing, or anesthetizing, when such practices, procedures, or provisions are not likely to result in injury to the wildlife.

"Harm" in the definition of "take" in the Act means an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering.

## CAUSE OF ACTION 2

## PERMANENT INJUNCTION TO PROHIBIT FUTURE VIOLATION OF ESA

112.    All facts pled elsewhere are incorporated by reference.

113.    What hangs in the balance by the Court's decision is neither a novel nor unique point of law, but a decision of fact regarding the continued existence of the endangered jaguarundi in Texas and the United States, a treasure for our citizens, their children, and the heritage we leave and pass on to yet unborn future generations as urged by President Teddy Roosevelt over 100 years ago.

114.    One might wonder why ESA cases tend to concentrate in district courts in some areas more than others.   The simple answer is that some states such as Texas have unique ecological features which bless the state with an abundance of wildlife.  Texas has the sixth most endangered species in the United States with 103 endangered species.[12]   Many cases originate in California because with 290 endangered species it is second only to Hawaii, which has 502 endangered species.  Other states with unique and rich wildlife resources such as Montana tend to have concentrations of the endangered species and thus ESA related cases and activity.

115.    "*We have fallen heirs to the most glorious heritage a people ever received, and each one must do his part if we wish to show that the nation is worthy of its good fortune.*"  President Teddy Roosevelt.[13]

116.    While the usual standards for injunction are axiomatic, there are some unique aspects in consideration of whether to grant injunctions in cases seeking to protect endangered species.

117.    The standard for a permanent injunction in an ESA case is clearly explained by the district court in the D.C. Circuit.

---

[12] https://ecos.fws.gov/ecp/report/species-listings-by-state-totals?state=TX&submit=Go

[13] https://gearjunkie.com/conservation-quotes-president-theodore-roosevelt

The standard for a permanent injunction is a familiar one. [Plaintiff] must convince the Court of four things:

(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*Monsanto Co. v. Geertson Seed Farms,* 561 U.S. 139, 156–57, 130 S.Ct. 2743, 177 L.Ed.2d 461 (2010) (quoting *eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 391, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006)). ***While the first element is recited in the past tense, the Supreme Court has recognized that it may include future harm.*** *See Monsanto,* 561 U.S. at 162, 130 S.Ct. 2743 (finding respondents did not adequately show "that they <u>will</u> <u>suffer</u> irreparable injury" if the agency were "allowed to proceed" (emphasis added)). And when an injunction is being considered as a remedy for a violation of Section 7 of the ESA, ***"the third and fourth factors ... are generally considered to tip in favor of the species."*** NMFS Cross-Mot. at 40 (citing *Hill,* 437 U.S. at 194, 98 S.Ct. 2279). ***In passing the ESA,*** ***"Congress has spoken in the plainest of words, making it abundantly clear that the*** ***balance has been struck in favor of affording endangered species the highest of*** ***priorities."*** *Hill,* 437 U.S. at 194, 98 S.Ct. 2279 (enjoining construction of dam that was nearly completed)(emphasis added).

*Conservation Law Found. v. Ross,* 422 F. Supp. 3d 12, 31 (D.D.C. 2019), *appeal dismissed,* 19-5365, 2020 WL 2610894 (D.C. Cir. 2020)(Section 7 vs. Section 9 does not matter for this point).

118.    As with any case, mere possibility is not adequate, but imminent harm must be shown in "reasonable certainty" according to a recent opinion from the district judge in the Austin Division of the Western District involving Kinder Morgan pipeline company.  The factual record in that case was highly speculative and lacked the very real imminent pending harms present in this case.

119.    ***Further, in the case against Kinder Morgan, the USFWS had issued an "Incidental Take*** ***Authorization," which not is only absent in this case, but here, the USFWS has clearly opposed*** ***Defendants' proposed activities due to the likelihood of unauthorized incidental take.***

A Court's power to order injunctive relief in an ESA case "depends, as in all other cases, on whether plaintiffs have established by a preponderance of the evidence, that there is 'a reasonably certain threat of imminent harm to a protected species.' " *Aransas Project v. Shaw,* 775 F.3d 641, 663–64 (5th Cir. 2014) (quoting *Defenders of Wildlife v. Bernal,* 204 F.3d 920, 925 (9th Cir. 2000)). While an extinction-level harm to the species is not required for an injunction under the ESA, Plaintiffs must show a "definitive threat of future harm to protected species, not mere speculation." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.,* 886 F.3d 803, 819 (9th Cir. 2018) (citing *Nat'l Wildlife Fed'n v. Burlington N. R.R.,* 23 F.3d 1508, 1512 n.8 (9th Cir. 1994)). "[A] preliminary injunction will not be issued simply to prevent

the *possibility* of some remote future injury." *Winter*, 555 U.S. at 22, 129 S.Ct. 365 (emphasis added). An injunction may issue "only if future injury is 'certainly impending.' " *Aransas Project*, 775 F.3d at 664 (citing *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).

*City of Austin v. Kinder Morgan Tex. Pipeline, LLC*, 447 F. Supp. 3d 558, 567, 2020 WL 1324071 (W.D. Tex. 2020).

120.   Kinder Morgan's construction of a large pipeline in the *City of Austin* was authorized through an administrative process under Section 7 of the ESA.   In the citizens' suit against Kinder Morgan, the USFWS had issued "Incidental Take Authorization."  At the time Plaintiffs sought an injunction, "the damage had already been done," and there was no showing of imminent future irreparable harm.

121.   Here, this case presents the converse scenario to the *City of Austin v. Kinder Morgan.*  Here, the USFWS has <u>not</u> issued an Incidental Take Authorization and the worst harms are yet ahead in the future.

122.   In stark contrast to the *City of Austin v. Kinder Morgan* case, here the USFWS has clearly opposed Defendants' proposed activities due to the likelihood of unauthorized incidental take. See, Exhibits 1 and 2, letters from the USFWS to Defendants.

123.   "Take" is intended to be construed very broadly to the benefit of the endangered animal.

The term "take" is to be construed liberally. Forest Conservation Council v. Rosboro Lumber *Co.,* 50 F.3d 781, 784 (9th Cir.1995). It should be " 'defined in the broadest possible manner to include every conceivable way in which a person can 'take' or attempt to 'take' any fish or wildlife.' " *Id.* (citing S.Rep. No. 307, 93d Cong., 1st Sess., *reprinted in,* 1973 U.S.C.C.A.N. 2989, 2995); *see also Babbitt v. Sweet Home Chapter of Communities for a Great Oregon,* 515 U.S. 687, ——, 115 S.Ct. 2407, 2416 132 L.Ed.2d 597 (1995). Indeed, courts have construed "takings" of endangered species to occur in a number of expansive ways. *See Defenders of Wildlife v. E.P.A.,* 882 F.2d 1294, 1301 (8th Cir.1989) (EPA's registration of pesticides containing strychnine constituted a taking of endangered species); *Loggerhead Turtle v. County Council of Volusia County,* 896 F.Supp. 1170, 1180–81 (M.D.Fla.1995) (artificial beach lighting and vehicular beach access found to be a taking of sea turtles); *Sierra Club v. Yeutter,* 926 F.2d 429, 438–39 (5th Cir.1991) (Forest Service's management of timber stands a taking of the red-cockaded woodpecker); *Swan View Coalition, Inc. v. Turner,* 824 F.Supp. 923, 940 (D.Mont.1992) (sufficient evidence to withstand summary judgment for grizzly bear

takings claim due to open road densities in forest land); *984 *Palila v. Hawaii Dep't of Land and Natural Resources,* 639 F.2d 495, 497–98 (9th Cir.1981) (*Palila I*) (state department's practice of maintaining feral goats and sheep in endangered bird's critical habitat constituted unlawful taking); *National Wildlife Federation v. Burlington Northern Railroad,* 23 F.3d 1508, 1509 (9th Cir.1994) (railroad's killing of grizzly bears along railroad tracks is a taking).

*Strahan v. Coxe*, 939 F. Supp. 963, 983–84, 1996 WL 581767 (D. Mass. 1996), *aff'd in part and vacated in part*, 127 F.3d 155, 45 ERC 1321, 28 Envtl. L. Rep. 20114, 1997 WL 613017 (1st Cir. 1997)

124.    Given the consequences of "getting it wrong," Courts considering injunctions, especially

preliminary injunctions, consider the intent and purpose of the law under which the relief is sought.

In the ESA context, the standard for a preliminary injunction is "not onerous."

Plaintiffs must demonstrate that irreparable injury "is *likely* in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008) (emphasis in original). A "possibility" of irreparable harm cannot support an injunction. *Id.* The Ninth Circuit has recognized that "establishing irreparable injury"—the remaining factor—should not "be an onerous task" given "the stated purposes of the ESA in conserving endangered and threatened species and the ecosystems that support them." *Cottonwood*, 789 F.3d at 1091.

A court determines irreparable harm by reference to the purposes of the statute being enforced. *Nat'l Wildlife Fed'n*, 886 F.3d at 818 (citing *Garcia v. Google*, 786 F.3d 733, 744-45 (9th Cir. 2015)). The types of harms that may be irreparable "will be different according to each statute's structure and purpose." *Sierra Club v. Marsh*, 872 F.2d 497, 502-03 (1st Cir. 1989). The Court determined that the Corps violated § 7 of the ESA. (Doc. 130.)

*N. Plains Res. Council v. U.S. Army Corps of Engineers*, 460 F. Supp. 3d 1030, 1041–42 (D. Mont. 2020)

125.    ***"Congress has decided that under the ESA, the balance of hardships always tips sharply in favor of the endangered or threatened species."*** *Washington Toxics Coal. v. Envtl. Prot. Agency*, 413 F.3d 1024, 1035 (9th Cir. 2005); *accord, All. for the Wild Rockies v. Kruger*, 35 F. Supp. 3d 1259, 1266–67, 2014 WL 3865936 (D. Mont. 2014)(emphasis added).

126.    Closer to Cuero, the home of the jaguarundis in DeWitt County, the district court in Corpus

Christi also held the balance strongly favors protection of the endangered animal:

"'*When an injunction is sought under the ESA, the traditional balancing of equities is abandoned        in favor of        an        almost        absolute        presumption        in favor of the endangered species.*' See Defenders of Wildlife v. Administrator, E.P.A., 688 F.Supp. 1334, 1355 (D.Minn.1988), aff'd in part and rev'd in part on other grounds (citing Tennessee Valley Authority v. Hill, 437 U.S. 153, 173, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978); Sierra Club v. Marsh, 816 F.2d 1376, 1383 (9th Cir.1987))."*

*Aransas Project v. Shaw,* 930 F. Supp. 2d 716, 775 (S.D. Tex. 2013), *rev'd*, 756 F.3d 801 (5th Cir. 2014), *opinion amended and superseded*, 775 F.3d 641 (5th Cir. 2014)(emphasis added).

127.    The Aransas Project case was reversed on other grounds, a question of foreseeability in causation, whether the failure to implement conservation measures by the TCEQ Commissioners and a river authority was too remote to constitute the proximate cause of the deaths of Whooping Cranes wintering at the Aransas National Wildlife Refuge.[14]

128.    Here, while Defendants' deliberate acts in this case unquestionably have caused real damage, the worst lies ahead on the near horizon unless this Court enjoins their planned acts to bring in a large drilling rig, operate it for months including using large equipment on the back of trucks to "frac" the well bores which produces an incredibly loud and offensive sound which carries for a mile or more away, construct a pipeline, and then possibly place and permanently operate a compressor to maintain pressure in the pipeline.

129.    The extremely loud sounds and disturbances are very likely to significantly interfere with "feeding, breeding, or sheltering" of the endangered jaguarundi in the area of the sightings.

130.    Ocelots, the other endangered cat in Texas and most comparable field evidence similar to the situation at the Hamilton Ranch, have been killed repeatedly by cars and trucks when disturbed and pushed out of their home on the Laguna Atascosa National Wildlife Refuge.

---

[14] The undersigned, Mr. Mundy, was one of the trial attorneys for Plaintiff in that case.



131.

https://blog.nature.org/science/2016/05/25/shocking-surge-ocelot-deaths-texas-roadkill-wildlife/

132.    Most recently in March 2020 another ocelot was killed on a highway.

https://fronterasdesk.org/content/1466626/endangered-ocelot-killed-after-being-struck-car-sonoran-highway

133.    Other examples of ocelots killed by cars:   https://www.valleycentral.com/news/local-news/ocelot-killed-by-car-along-highway-100-near-los-fresnos/

134.    http://www.myharlingennews.com/?p=43152

135.    The repeated occurrence of the endangered ocelots being killed by cars caused the Texas Department of Transportation to build special culverts to facilitate the endangered animals crossing under roads, which the ocelots are now using.

https://www.fws.gov/news/blog/index.cfm/2020/2/24/Its-a-First-Ocelot-Crosses-Under-the-Road

136.    The USFWS is very clear and unequivocal about risks to the endangered cats in South Texas.

> In the last 75 years, the ocelots' native habitat in the lower Rio Grande Valley of South Texas has disappeared. The small amount that remains is often broken up into smaller tracts of land, fragmented by roads, fences, agriculture, golf courses and other development. This habitat loss and fragmentation has left ocelots stranded in small groups on isolated pockets of habitat. This in turn has led to other problems.

> When an ocelot begins to mature, it must leave its parents and go out in search of its own territory. This can be a very dangerous time in an ocelot's life. Because so little habitat remains and so much is fragmented, the small cats must often travel long distances to find enough food, water and suitable habitat to survive and reproduce. Having to travel longer distances means having to cross dangerous highways and avoid urban areas and territories occupied by other ocelots. Too often ocelots are hit and killed by cars. Nearly half of the ocelots studied around the Laguna Atascosa National Wildlife Refuge have died as a result of getting hit by a car. [15]

137.    Defendants blocked a culvert in a location that could have been used by the jaguarundis to cross under the road.  Now Defendants want to increase the amount of heavy truck traffic at the critical location where jaguarundis have been seen crossing this rural road.

138.    Game camera photos on the road between Defendants' proposed pad and the Deer Pasture show cats using culverts under the road.  Defendants have run "flex tube" through these same culverts, thus impairing animals' ability to use the culvert and thus forcing them up onto the road increasing the likelihood of being hit by a car or truck.

139.     Such a flagrant mindset highlights why an injunction is so desperately needed to protect these animals from the contumacious Defendants.

---

[15] https://www.fws.gov/refuge/laguna_atascosa/wildlife_and_habitat/ocelot.html

140.    In a state court proceeding brought by Plaintiff for an alleged breach of an obligation under the oil and gas lease known as the "accommodation doctrine", Defendants made clear their intention to proceed unless enjoined by either the state or federal court.[16]  Defendants removed that action to this Court previously, but this Court remanded for lack of jurisdiction over the purely state law accommodation doctrine claim.[17]

141.    Now the sole issue of protecting the endangered jaguarundi is before this court.

142.    The rancher is doing what he can to protect this cat.

## **RELIEF REQUESTED**

143.    Plaintiff brings this action in the public interest as the advocate and voice for the endangered animal that cannot speak for itself.   Plaintiff does not seek individual damages from this action.

144.    Plaintiff seeks all available penalties available, which are payable to the United States government, for Defendants' violation of the Endangered Species Act including daily penalties as provided by 16 U.S.C.A. § 1540. The daily civil penalty of $25,000/day is subject to the Civil Monetary Penalty Inflation Adjustment Rule.  The current 2021 daily penalty is $54,167 per day of knowing violation.[18]

145.    No damages are available which can cure or remedy the harm Defendants' proposed future conduct poses to these jaguarundis.

---

[16] A transcript has been requested from the court reporter in that proceeding.

[17] The state court action remains pending on Texas state oil and gas law issues without a cause of action for violation of the Endangered Species Act.

[18] https://www.federalregister.gov/documents/2021/03/23/2021-05779/civil-penalties-2021-inflation-adjustments-for-civil-monetary-penalties

146.    Thus, Plaintiff requests the Court to permanently enjoin Defendants from conducting their activities the currently proposed locations and impose such "best management practices' to control sound and light, risks from traffic, and other protections in areas within at least 0.6 miles with an additional buffer from any area in which jaguarundis have been seen which will provide adequate protection for the jaguarundis in the vicinity of the Hamilton Valley View Ranch in DeWitt County, Texas.

147.    Plaintiff requests reasonable and necessary attorneys' fees and costs as allowed by 16 U.S.C.A. § 1540, which provides:  "(4) The court, in issuing any final order in any suit brought pursuant to paragraph (1) of this subsection, may award costs of litigation (including reasonable attorney and expert witness fees) to any party, whenever the court determines such award is appropriate."

148.    Plaintiff requests all other available remedies available as may be shown by the facts and applicable law.

Respectfully submitted,

Jeffery Mundy
Texas State Bar No. 14665575
Federal Bar No. 10632
The Mundy Firm PLLC
4131 Spicewood Spring Road, Suite O3
Austin, Texas 78759
(512) 334-4300 Office
(512) 750-5913 Cell
(512) 590-8673 Fax
jeff@jmundy.com

ATTORNEY IN CHARGE FOR
LLOYD MICHAEL HAMILTON

Charles Irvine
Texas Bar No. 24055716
Irvine & Conner PLLC
4709 Austin St.
Houston, TX 77004
Tel.: (713) 524-1012
Fax:  (713) 524-4165
charles@irvineconner.com


ATTORNEY FOR
LLOYD MICHAEL HAMILTON




Exhibit 1 – July 29, 2020 – USFWS letter to Conoco Ozment & Fox

Exhibit 2 – September 3, 2020 – USFWS to Conoco Widmer